Case number 146521 Village Green I GP v. Federal National Mortgage Association Or arguments not to exceed 15 minutes per side. John Lewis Ryder for the appellate. Good morning, Your Honor, and may it please the court, I'm John Ryder, counsel for the debtor, Village Green I GP, the appellant in this case. I believe we've reserved five minutes for rebuttal. This case arises from a Chapter 11 bankruptcy which was filed in 2010 at the onset of the recession. The plan was confirmed in 2012. It's a Chapter 11 plan which proposes to pay 100% to the unsecured creditors and to the secured creditors, including Fannie Mae. In fact, in the course of the bankruptcy between commencement of the case and the confirmation in 2012, the debtor paid a little over a million dollars to Fannie Mae under the cash collateral order. And subsequent to confirmation under the orders granting stays pending the multiple appeals in this case, the debtor has paid $1,274,000 to Fannie Mae. So that Fannie Mae has received since the commencement of the case approximately $2.3 million. What was the amount of their, I guess, secured and unsecured debt? The secured debt was placed at $5.4 million, which was the value of the collateral. The unsecured debt was $3.2 million, $3.4 million, then adjusted down for the credits paid in during the pendency of the plan so that the unsecured claim treated under the plan was $2.2 million. The appeal that we're on today, and we've been through since confirmation, we've been through three appeals to the district court and five orders. Why didn't you try to certify an appeal here on an interlocutory basis? We could have done that. I mean, possibly. Had a lot of rounds in this. We have had a lot of rounds in this, and of course the question, there was sort of an open question during the pendency of this case as to whether an order denying confirmation was final. That was resolved last term of the Supreme Court in the Bullard case. But then you'd just have to seek certification, right, under the bankruptcy code procedure? Correct. Well, we thought we were going to win. Oh, in the Supreme Court case or something? We thought we were going to win at the district court level. We thought we would prevail at the bankruptcy court level because we think the real issue here, and always has been, is whether the plan that the debtor proposed can be confirmed, it should be confirmed. I'm sorry. Go ahead. In the present posture, if the plan can be confirmed, then there is a reorganization in prospect which negates the grounds for relief from the stay. And if it can be confirmed, then there's no cause for dismissal. So the case comes to this court for an independent review of the bankruptcy court decision, not the district court decision. As noted in 255 Park Plaza Associates, where this court said, this court in turn considers directly the judgment of the bankruptcy court using the same standards of review as the district court  We believe the plan was properly confirmed by the bankruptcy court, actually twice. Bankruptcy court found that the plan complied with all the provisions of 1129A except for A8, and that there was an accepting impaired class under 1129A10, which allowed the parties to proceed to a hearing under 1129B. And at the confirmation hearing, the bankruptcy court found that the plan complied with 1129B in that it was fair and equitable and did not discriminate unfairly. After all the appeals, the issues remaining with respect to confirmation, I think, are two. First, does the impairment of class 3 comply with the good faith requirement of 1129A3? And second, are the modifications of the loan documents fair and equitable with respect to Fannie Mae under 1129B1? So with respect to the impairment of class 3, that's the class with the attorney and the accountant? No, class 3, which is the two small unsecured claims. That's exactly right. The attorney and the accountant. I'm sorry, Your Honor. I was thinking attorney. When I think attorney... The attorney and the accountant together had roughly... $2,400. $2,400 of claims. Correct. And they were going to be delayed in payment for two months. Correct. I must say it looks weird to an outsider why that class would approve the delay and thereby prevent Fannie Mae, which is the big creditor, from successfully objecting to the plan. It seems to an outsider like a setup. Well, that touches, Judge, more exactly on what this case is about. It's who gets to vote on the plan. Do the small creditors get to vote on the plan? Class 3 originally consisted of four creditors. There were two other small creditors. What happened to them? Fannie Mae, during the course of the bankruptcy, tended payment to all four of the creditors in Class 3. Two creditors took the money. Two creditors did not. Then the debtor moved to amend the schedules. Fannie Mae objected to the remaining creditors. There was a hearing before Judge Emerson, the bankruptcy judge. Correct me when I'm wrong, but they're the accountant and the lawyer for Village Green, right? So to me, as an outsider looking in, I think it looks like it's an inside job, that it's a setup, that it's a devious way, i.e., it's not in good faith, to preclude Fannie Mae, which is the big creditor here, from being able to have its objections heard. I think not, Your Honor, and for this reason. And that's why the hearing on the objection to the claims of these two creditors, brought on by Fannie Mae's objection, is important to that issue, because the bankruptcy judge heard the testimony regarding the validity of those claims. The lawyer who represented Fannie Mae pre-petition was not their regular lawyer. He was a lawyer hired specifically to oppose Fannie Mae's attempt to get a receiver appointed in chancery court in the state court system. So he was not. He was the lawyer for Village Green. The lawyer, yes. He said Fannie Mae. The gentleman who testified there. The gentleman who testified, that's correct. That's correct, Your Honor. Just to echo Judge Moore's point, it's not whether the claim is legitimate, the bill was legitimate. It just seems wholly contrived to delay payment of truly a de minimis claim for 30 and then 60 days in order, frankly, to circumvent a requirement that Congress put in the statute. I mean, it just seems like it's contrived. And if it's not, I guess I want to understand why. Quite to the contrary, Judge Kethledge, the Congress did not put into the statute any requirement about the motivation or the ability of the debtor to impair or unimpair. I grant you, impaired is defined, but it sure looks like this is an attempt to circumvent that de facto. Not de jure in the sense that we can say he didn't meet A-10, but sure looks like de facto circumvention. But I want to give you a chance to tell us why not. Two points on that. Number one, as Your Honor notes, 1123B1 gives the debtor broad power to impair. It says a plan may impair or leave unimpaired any class of claims. And I think that broad discretion goes to this point. Remember that obtaining the vote of an accepting impaired class does not confirm the plan. It only gives everybody their day in court in an 1129B hearing. Why do you think Congress has that requirement that an impaired creditor has to buy into the plan before we can do a cram down? What's the purpose of that? Because everybody who's not getting all of their rights, their unaltered, equitable, contractual, and legal rights under the plan should have an opportunity to weigh in on the plan and to be heard. But why would Congress require one impaired creditor to buy in before they cram down? Because if no creditor buys in, then you have a situation in which the debtor has been unable to convince any creditor class that its plan is worthy of consideration. So if the creditor class that the debtor convinced were true outsiders who legitimately were willing to agree to this plan, then you could see that Congress's intent might be satisfied. But the concern that I have is when the class is a class with a de minimis claim and that has a relationship with the debtor, and when there doesn't seem to be any reason to delay payment for two months of a $2,400 claim, given that there are millions of dollars involved in this. If I may respond, I see my time is about up, but if I may respond, two points. Number one, that's why the hearing on the objection to the claim, again, becomes important, because the court determined that these were valid and legitimate claims. There was also an objection to classification at confirmation. Fannie Mae objected to the treatment of the claims different from the deficiency claim, and the judge overruled that objection as well. Finally, in the supplemental findings of fact and conclusions of law after the first remand, the bankruptcy judge found that there was an economic justification that satisfied the requirements of 1129A3. Remember that A3 requires that the plan be proposed in good faith. So you measure good faith, and if you're going to look at debtor's intent, which we don't think you should, but if you're going to look at that, you look at it as of the date the plan is proposed, not the date it's confirmed, because that's a requirement of the code. So at that time, there was still a very serious issue about Fannie Mae's misapplication refusal, wrongful refusal to release the reserve accounts, and misapplication of the funds that it was holding. And that issue had not been resolved as of the date the plan was proposed. So as of the date the plan was proposed, the bankruptcy court was absolutely entitled to find that the debtor had every reason to try to conserve every penny that it could, including these pennies paid to the Class III creditors. Thank you, Your Honor. Can I ask you a quick question? Yes, yes, Your Honor. If you were to prevail, what would be the status of this matter? We would ask that the court reverse the decision that is actually on appeal regarding dismissal and relief from stay and direct that the plan be confirmed. Thank you, Your Honor. Thank you. Good morning, Your Honors. My name is Daniel Slate. With me is Mark Bailey. We represent Fannie Mae. I believe it was Judge Moore who said this seems wholly contrived to delay, to circumvent confirmation. No, it was you, Judge. Wholly contrived. This case was wholly contrived from the down stroke. When the debtor filed its Chapter 11 bankruptcy case in April 2010, they named 26 unsecured creditors. None of them were creditors of the debtor. The debtor's principal, Mr. Clausen, who is not only the manager of the debtor but also the manager of the management company and the debtor of the master tenant, the property was subject to a master lease, so he wore all three of those hats. The debtor's principal testified that maybe two weeks after the case was filed, he knew that none of those creditors that were listed were, in fact, creditors of the debtor. Nevertheless— If I could get to the problem that I have with your side of the case, the bankruptcy judge ruled against you. Yes. We're supposed to defer to the bankruptcy judge and review its decisions for abuse of discretion, I think. And so how can we say, when the bankruptcy judge is the one who hears the evidence and is intimately familiar with this case, how can we say that that judge abused its discretion? Well, Your Honor, with respect to abuse of discretion, the order that's on appeal is the dismissal and the relief from stay, and we do not believe that he did abuse his discretion. With respect to the findings of confirmation, the question is whether or not those findings are clearly erroneous, and I believe that they are. In the first instance, the bankruptcy judge found that because of the handling of the reserve accounts, which, by the way, were Fannie Mae's collateral, and pursuant to which, under the terms of that agreement, they were entitled to sweep them upon default. So there were no funds upon the commencement of his bankruptcy. Before we run off on that, I mean, just to stay on what Judge Moore, I think, was talking about, doesn't their notice of appeal in this case allow them to challenge all the prior adverse orders against them? I mean, they couldn't come here earlier for all the adverse orders unless they sought certification, which, for whatever reason, they didn't. Now they're here. Everything's final. I mean, are we now going to say, well, you know, actually you can't challenge these things now either? Is that what you're arguing? Judge Guy asked the good question, which is? Well, I'm asking a jurisdictional question. Is it your contention that they are not able to challenge the prior orders other than the sua sponte one and the district court one that was favorable to you? Jurisdictionally, no. It's not your argument? I'm not arguing that this court cannot address A3 and impairment and fair and equitable. Yes. But the question Judge Guy asked is, if you win, where do you go? And the problem with the debtor's response is there are no findings. We've been talking about impairment and good faith. With respect to fair and equitable, there are no findings whatsoever to support, as I say, I think with some color, the wholesale gutting of the creditor protections that are in the deed of trust. Common provisions, like requiring the property be maintained, requiring insurance on the property, the new management agreement, which according to the plan would control the relationship between the debtor and Fannie Mae post-confirmation, and is signed by Mr. Clausen as the representative of the debtor, and Mr. Clausen as the representative of the management company, can be terminated on 30 days' notice and no notice to Fannie Mae. Did the bankruptcy court's order that approved the plan, so this would have been before it goes up to the district court and then goes back, the order before the sua sponte from the bankruptcy court, did that speak at all to these lease terms that you're discussing now? The loan terms. I'm sorry, the loan terms. The only thing the judge said with respect to that is something along the lines of, I don't see anything in the loan documents that are, quote, so sacred, end quote, that they can't be modified. Fair and equitable is a squishy term in the bankruptcy. It's supposed to be not just the definition in the statute, but also fair and equitable in the normal sense of those words. And the cases that support modification of loan docs, Trenton, for example, which the debtor cites, involved a modification of the due-on-sale clause, a modification that was required in order to confirm the plan. And it didn't do away with the due-on-sale clause. It reinstated it immediately after this transfer from the debtor to the debtor's affiliate. And they added, I think, seven words. Our plan on the other hand, or rather the debtor's plan, just crosses whole paragraphs out of the deed of trust. When the debtor says that Fannie Mae is not taking its own best interest because it's not buying into this plan, which proposes to pay everybody off in full, I struggled with how best to analogize that. And since there's a river between where I stayed last night and where we are today, I thought maybe a ferry boat that is leaking, where there's an inch between the water level and the gunnels, and the ferryman says, don't worry, I'll get you across the river. The fellow who's going to get on that boat has the right to sit there and go, I don't think I want to get on that boat. That is the debtor's plan, which promised payment in full in ten years, but without the supervision, without the maintenance, which is necessary to maintain the value of the property. It's the trust us plan. You bet. It's I'll pay you when I win the lottery. So those are problems. But going back to the contrived, the debtor over the next year filed a number of plans, a number of amendments to the schedules, including each one of those 28 creditors that are not creditors. It wasn't until Fannie Mae filed objections to every one of them that the debtor, we filed objections to every one of those unsecured creditors, because we knew that they weren't creditors. The debtor then had the temerity to file a motion to temporarily allow those creditors to vote on the plan. And then three days later withdrew that motion. And then several days after that, filed a motion to amend the schedules because they, quote, recently discovered that those creditors were not actually creditors of the debtor. So you're going into what we could call bad acts by your opponents earlier in the case. Yes. Can you tie that to what we're supposed to be deciding now? Well, where it gets to is all in good faith. And there is a sentence. There are many sentences that are disagreeable in the debtor's papers. Here it is. The debtor compares itself and its plan to the plan in Villages of Camp Bowie. And he says, Similar to the plan confirmed by the bankruptcy court in Camp Bowie, Village Green's fifth amended plan, as confirmed, is a legitimate plan to reorganize. Now, first of all, Camp Bowie imposed the good faith review, the A3 assessment, even with respect to impairment. And I don't think the debtor is there. I think the debtor is saying, If we comply with A10, there is no good faith assessment of the impairment. But the facts of Camp Bowie stand in stark contrast with the facts of this debtor. This was the Fifth Circuit case? Yes, Your Honor. In Camp Bowie, the secured creditor was oversecured. Fannie Mae is undersecured. Camp Bowie, there was $2 million in equity available after payment of the secured debt. In Village Green, it's $3.1 million in negative value. In Camp Bowie, the current equity injected $1.5 million of new money into the debtor at confirmation. Under Village Green, no new money. Camp Bowie, independent third-party property manager. We've already talked about how, with Village Green, we do not have that. There is no reference to modification to creditor's rights in the loan documents in Camp Bowie. And again, there's a wholesale rewrite. In Camp Bowie, the reference was to 38, quote, independent third-party creditors. In our case, we have the debtor's accountant, and is also the accountant of 100 affiliated entities, and the debtor's lawyer. So those are the facts. These are very de minimis claims. This is the thing that bothers me about this case, is that their claims are tiny, and they're being delayed arguably for purposes because Village Green doesn't have the money to pay them off, and they're truly de minimis claims. There's no reason to delay the payment of those. Mr. Claussen testified as part of his feasibility assessment that, first of all, there's $2 million, $2 million in effective gross income per year on this property in calendar 2011. Your opponent argues that we should judge whether they could have been paid off, these two de minimis-related people, by the time that the plan was proposed. Does that make any difference here? No, Your Honor, because the debtor's projections were first $800,000. I believe they modified it down to $600,000 in net operating income. And that is after taking into account $400,000 per year in, as the debtor testified, flexible capital expenditure spending, meaning he could spend it, as Mr. Claussen testified, he could spend it or not depending upon whether or not there's availability. With those numbers bandied about, I did not undertake the net present value of $1,200 in 30 days and another $1,200 in 60 days, but I would suggest to you that it is relatively, it's extremely modest. What was the source of the $400,000 flexible capital spending as testimony by Mr. Claussen, you said? From cash flows generated from the property. Yes, Mr. Claussen testified. And by the way, when the debtor testifies, when Mr. Ryder, excuse me, sorry about that, Mr. Ryder, when Mr. Ryder makes statements about how the debtors paid several millions of dollars to Fannie Mae since confirmation or since the case was confirmed, I should note that what the debtor paid was $900,000 less than the note obligations. So what the debtor is really doing is paying a significant percentage of what he was obligated to pay before the bankruptcy was filed. So if we were to affirm, as you're urging, what would be the result in this case? Fannie Mae would foreclose. There would be no loss of jobs because the property would be managed and the people who were performing those services would continue to manage the property. Frankly, I'm not familiar today with the condition of the property, but one of the things Fannie Mae does is take seriously its good stewardship and its good citizenship, and if it needs a cash injection, it would put that cash in to improve the condition of the property. But that would be what would happen if Fannie Mae would foreclose. I mean, just as a factual background, this is a single asset debtor. It is. So the only asset of this debtor is the real estate. Well, not quite, because when the debtor filed its bankruptcy case, its affiliate, the master tenant under the master lease, owed the debtor, I believe, $300,000 or $400,000. At one point during the bankruptcy case, that number grew to $800,000. Now, I believe that that entity, which is, again, controlled by Mr. Clausen, is without assets, but there was, in essence, it was a one-asset case. And apart from sort of intra-collection of companies, intra-related companies' obligations, its just, so you would just be foreclosing on the real estate and you would not, so what happens then? I mean, its an affiliate of this debtor that is managing the property, right? Yes.  So what happens with them? I don't know, Your Honor. Is there managing other properties? I don't know. Okay. That's just a straight question. Now, if you were to foreclose, I assume then you would put the property back on the market. Ordinarily, Fannie Mae does. But, again, if there are property needs, Fannie Mae would provide that contribution. When a property is prime, Class A properties, typically they'll try to sell it quickly. But when the property is in need of repair, Fannie Mae will put the money in. Well, that's just prudent in terms of getting the best market price that you can get, I take it. Yes, Your Honor. We do not anticipate that at a foreclosure we would get paid in full because the property was worth $5.4 million a couple of years ago. I don't believe the market has doubled, so we're not going to get our $8.5 or $9 million in debt. But the short answer is this was a contrivance. This was a contrivance from the downstroke. And good faith, despite the debtor's argument to the contrary, is to be considered as part of impairment. And assessing the totality of the circumstances, which I think includes a comparison with Camp Bowie's facts, the circumstances that the debtor had in this case are so far different from Camp Bowie's facts as to warrant a determination that the plan was not in good faith. Thank you. Thank you. Let me address the issue of the loan modifications because on remand the bankruptcy court made some direct findings on that point. In the supplemental findings of fact and conclusions of law issued by the bankruptcy court, the court said this court has noted in its previous rulings that the relationship between Fannie Mae and Village Green is unfortunately very acrimonious. The court's docket reflects the litigious and contentious manner in which this Chapter 11 case has progressed. The court is well aware that Village Green is trying to distance itself from unrelenting accountability to Fannie Mae, its main lender. Given the manner in which Fannie Mae previously withheld the replacement reserve escrow from Village Green and then arbitrarily accounted for the funds set off, the court is not surprised that Village Green is attempting to prevent such issues from arising in the future. Village Green is afforded a greater chance for a successful reorganization, the ultimate goal under Chapter 11. And further, as to the management agreement involve a greater autonomy for Village Green and the property's management in paying taxes and insurance from escrow funds, which were under Village Green's control, and allowing the reorganized debtor to be more efficient in operating the property without unnecessary interference from Fannie Mae, Village Green will enjoy a greater likelihood of success going forward. Fannie Mae also enjoys a greater likelihood of being paid through the plan. What pages are you reading from, sir? That is from the supplemental findings of fact and conclusions of law issued by the bankruptcy judge. The opinion is July 19, 2013. Well, I mean, so, I mean, yes, the bankruptcy court is saying you have a better chance of success, I guess, if you have some autonomy from an acrimonious sort of partner in all this. But, I mean, does that equate to a fair and equitable determination as required by Chapter 11? I think so, Judge Kethledge. The court had the opportunity, the bankruptcy court had the opportunity to observe the conduct of the parties and as the court notes here. But, I mean, it seems to be just addressing kind of a subsidiary issue rather than an ultimate issue. Is this going to help you as opposed to, I mean, is this in your interest as opposed to whether it's fair and equitable, which takes into account their interest as well? Well, I mean, the court makes the specific finding that they are fair and equitable. Did? Where? What page? Clearly finds that. I mean, I guess that's what I'm interested in hearing. What page did the court say fair and equitable? The court finds that the reorganized debtor, it's on page 6 of the supplemental findings. The court finds that the reorganized debtor has met the technical requirements of 11 U.S.C. sections 1129B2A and B2B as well as the more general fair and equitable standard of 1129B1. That's helpful. Thank you. So there was a specific finding by the bankruptcy court that these loan modifications were fair and equitable. What about Mr. Claussen's testimony that there would be $400,000 of flexible capital spending during the time that apparently Village Green would be withholding a couple of thousand dollars from these two creditors? At the time, throughout the course of the proceeding and leading up to confirmation, Fannie Mae argued strenuously that there were repair and maintenance issues that needed to be addressed with that $400,000 so that at the time the plan was proposed. And one of the reasons those repair and maintenance issues existed was because, as the debtor applied to the lender for access to the replacement reserves, access was denied by the lender. So the debtor didn't have the money to do the repair and replacements that needed to be made on the property because the lender refused to advance the money that the debtor had deposited into the account to make those replacements and repairs. The result was the debtor was strapped for cash, even with the $400,000. We had significant arguments at confirmation about the extent of the repairs that needed to be made. That's helpful. Thank you. And to compound the fact, the fact is the debtor did not have the money to pay all of its administrative costs at confirmation, as I can attest. And those did not get paid in a timely fashion. And we agreed to alternative treatment as permitted under the code. But the debtor was strapped for cash. The important thing to remember, though, is that good faith is measured by a totality of the circumstances, of which one factor may be the impairment of the claim. We don't think it should be. We think that the approach to impairment is a purely mechanical one, as permitted by the broad discretion under 1123 in allowing the debtor to determine which classes are impaired and which are not. But if the court follows the path of Windsor and other cases saying that impairment is a factor to be considered in the good faith analysis under A3, then it is only one of many factors in determining good faith. And the bankruptcy court clearly, in its original confirmation order and in the supplemental findings, finds that the debtor acted and proposed the plan in good faith under A3. Thank you. Thank you very much. Thank you both for your argument. The case will be submitted.